UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: Grand Theft Auto Video Game Consumer Litigation (No. II) | 1:06-md-1739 (SWK) (MHD) |
| *This Document Relates to*: All Actions | |

## PLAINTIFFS' CONSOLIDATED AND AMENDED COMPLAINT

Plaintiffs, by and through their undersigned counsel, for themselves and all others

similarly situated, hereby bring this Consolidated and Amended Complaint against Defendants

Take-Two Interactive Software, Inc., and Rockstar Games, Inc. ("Defendants"). Plaintiffs make

the following allegations based upon their personal knowledge as to their own acts, and upon

information and belief as well as upon their respective attorneys' investigative efforts as to

Defendants' actions and misconduct as alleged herein:

### Nature of The Action

1.      In this class action lawsuit, Plaintiffs seek to obtain damages and/or compensatory

restitution for Defendants' wrongful and illegal sales and marketing of a video game, *Grand

Theft Auto: San Andreas*, that contained within it explicit simulated sex scenes that constituted a

"game within a game" which could be "unlocked" by means of instructions and codes that came

to be readily available on the Internet once the existence of the pornography became known.

Whether through intentional, reckless, or negligent action, Defendants marketed and sold *Grand

Theft Auto: San Andreas* notwithstanding the fact that its content was misrated under the rating

protocol that exists for video games, and that the game had to be, upon discovery of the

embedded pornography and the resulting public outcry, relabeled by the industry sponsored ratings board as an "Adult Only" video game.  As a result, consumers like Plaintiffs herein purchased the game not knowing of the pornographic content and accordingly have suffered harms sounding in their claims set forth below for (a) violations of Uniform Deceptive Acts and Practices statutes (sometimes also referred to as "Consumer Protection Statutes"); (b) breach of the implied warranty of merchantability; and (c) unjust enrichment.

2.      Plaintiffs further seek declaratory and injunctive relief to prevent a reoccurence of such wrongful activity by Defendants inasmuch as Defendants, as set forth below, have, even since *Grand Theft Auto: San Andreas* and the controversy it caused, continued to market and sell games in a fashion that is materially misleading and not in conformance with industry standards.

### Parties

3.      Plaintiff Susan Carlson is a resident and citizen of the State of Minnesota.   Not knowing of the game's sexual content, Ms. Carlson purchased *Grand Theft Auto: San Andreas* in or around December 2004 as a Christmas gift for her son Jeff Carlson, who at the time was 18 years old and the primary user of the game.  Ms. Carlson was shocked when she learned that the game contained graphic sexual images.

4.      Plaintiff Cindy Casey is a resident and citizen of the State of Pennsylvania and lives in Philadelphia.   Also not knowing of its sexual content, Ms. Casey purchased *Grand Theft Auto: San Andreas* in or around December 2004 as a gift for her son, who at the time was 15 years old and the primary user of the game.  Upon learning that what she purchased contained explicit sexual content, she disposed of it.

5.      Plaintiff Florence Cohen is a resident and citizen of the State of New York,

2

County of New York. An elderly widow, Ms. Cohen visited with her grandson in December 2004, and purchased *Grand Theft Auto: San Andreas* for him when he selected that as his Chanukah gift. The grandson was then 14. She later heard on TV or radio that the game contained material that was not suitable for minors. She became upset, and demanded that the game be taken from her grandson, so it could be discarded. She personally discarded it on her next visit to her grandson.

6.      Plaintiff Robert Samario is a resident and citizen of the State of California, County of Los Angeles. Mr. Samario purchased *Grand Theft Auto: San Andreas* in or around December 2004 as a gift for his son Robert, who at the time was 14 years old and the primary user of the game. Mr. Samario was unaware at the time he purchased the game that it contained graphic sexual images.

7.      Plaintiff Brenda Stanhouse is a resident and citizen of the State of Illinois, County of St. Clair. In 2005, Ms. Stanhouse purchased a copy of *Grand Theft Auto: San Andreas* in St. Clair County. She made the purchase to provide the game as a gift to her teen-aged children, aged 15 and 17. At the time of purchase, Plaintiff Stanhouse was unaware of the pornographic nature of *Grand Theft Auto: San Andreas*. Upon learning of the game's explicit nature, she took it away from her children.

8.      At the time that each of the Plaintiffs purchased *Grand Theft Auto: San Andreas*, the copies of the game that they purchased were rated and labeled "M" by the Entertainment Software Ratings Board ("ESRB") an industry self-regulatory organization, as set forth below.

9.      Defendants Take-Two Interactive Software, Inc. ("Take-Two"), and Rockstar Games ("Rockstar") are corporations organized under the laws of the State of Delaware and

which have their principal place of business in New York, New York.   Rockstar is a wholly-owned subsidiary of Take-Two and is one of the operating subsidiaries through which Take-Two produces, markets and sells interactive video games that are sold throughout all the States in which Plaintiffs reside and throughout the United States. With respect to the conduct alleged herein, the acts and alleged wrongdoing of Defendants Take-Two and Rockstar may be imputed to each other inasmuch as they acted as the agents, alter-egos or co-conspirators of each other.

### Jurisdiction and Venue

10.     This Court has subject matter jurisdiction over this matter pursuant 28 U.S.C. § 1332(d)(2) inasmuch as the Defendants are citizens of the States of New York and Delaware and the members of the Class alleged herein include persons who are citizens of States other than New York and Delaware; the action is a putative class action pursuant to Federal Rule of Civil Procedure 23, and the amount in controversy exceeds the sum of $5 million, exclusive of interests and costs.

11.     Venue is proper in this district pursuant to 28 U.S.C. §1391.

12.     This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

### Class Action Allegations

13.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of themselves and a class (the "Class") consisting of all individuals who purchased *Grand Theft Auto:  San Andreas* from the date of its introduction through at least July 20, 2005 (the "Class Period").   Excluded from the Class are defendants, any entity in which defendants have a controlling interest, and any of their subsidiaries, affiliates, and officers and

4

directors.   Plaintiffs reserve the right to amend the class definition, including the Class's

possible division into subclasses, in order to obtain substantial justice for the wrongdoing

asserted herein.  For instance, as set forth herein, a claim is asserted by Mr. Samario pursuant to

California's Song-Beverly Act, Cal. Civ. Code § 1790, *et seq.*, and a subclass of California

residents may be appropriate for such a claim.

      14.     The Class consists of thousands of individuals, not only within the States of which

Plaintiffs are citizens but the other United States.  Several million copies of *Grand Theft Auto:*

*San Andreas* were sold during the Class Period.   Numerosity is therefore satisfied.

      15.     Plaintiffs' claims involve questions of law and fact common to the Class, because

Plaintiffs and other members of the Class were similarly affected by Defendants' unlawful and

wrongful conduct that is complained of herein.

      16.     Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs

have retained counsel competent and experienced in class and consumer litigation and, in

particular, this area of law, and Plaintiffs have no conflict of interest with other Class members in

the maintenance of this class action.  Plaintiffs have no relationship with Defendants except as

customers.  Plaintiffs will vigorously pursue the claims of the Class.

      17.     Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class.  Among the

questions of law and fact common to the Class are:

          a.     whether the games, as produced and sold by Defendants, contained

        explicit sexual content in their code which was undisclosed by Defendants;

          b.     whether the games contained a game rating of "M" on their packaging

5

when, in actuality, they should have been rated "AO";

      c.     whether Defendants' failure to ensure the accurate labeling of their games resulted from negligent, reckless or intentional behavior;

      d.     whether Defendants' actions respecting *Grand Theft Auto: San Andreas* violated state consumer protection and/or uniform deceptive acts and practices statutes in effect in the various States;

      e.     whether Defendants' actions breached the implied warranty of merchantability; and

      f.     whether Defendants' inaccurate labeling of the games as "M" rated when, in actuality, their content warranted an "AO" rating caused Defendants to be unjustly enriched when the totality of the circumstances are considered.

     18.     A class action is an appropriate and superior method for the fair and efficient adjudication of the controversy given the following factors:

      a.     Common questions of law and/or fact predominate over any individual questions that may arise, and, accordingly, there would accrue enormous economies to both the courts and the Class in litigating the common issues on a class wide basis instead of on a repetitive individual basis;

      b.     Class members' individual damage claims are too small to make individual litigation an economically viable alternative;

      c.     Despite the relatively small size of individual Class members' claims, their aggregate volume, coupled with the economies of scale inherent in litigating similar claims on a common basis, will enable this case to be litigated as a class action on a

cost-effective basis, especially when compared with repetitive individual litigation; and

      d.     No unusual difficulties are likely to be encountered in the management of this class action in that all questions of law and/or fact to be litigated at the liability stage are common to the Class.

19.     Class certification is fair and efficient as well because prosecution of separate actions would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which, as a practical matter, may be dispositive of the interests of other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

20.     Plaintiffs anticipate that there will be no difficulty in the management of this litigation, and means exist to address issues of damages as have been utilized in other class actions, including aggregate damages, claims processes and/or determination of restitutionary amounts.

## **Factual Background**

### A.    **The Video Game Industry and Its Self-Regulation by The ESRB**

21.     The video game industry in the United States reportedly accounts for revenues exceeding seven billion dollars annually.  It is a highly competitive industry where video game companies continuously are producing more novel and technically sophisticated games for the consumer to play.

22.     Depending on the nature and content of a particular video game the Entertainment Software Rating Board (ESRB), a self-professed self-regulatory body established in 1994 by the Entertainment Software Association ("ESA"), awards the game a rating.  According to its

7

website, www.esrb.org,  the ESRB "independently" applies and enforces ratings, advertising

guidelines, and online privacy principles adopted by the industry.  The ESRB rates over 1,000

games per year.  As it describes itself:

> ESRB independently assigns computer and video game content ratings,
> enforces industry-adopted advertising guidelines and helps ensure
> responsible online privacy practices for the interactive entertainment
> software industry.

23.    The ESRB's view of the market for video games

and for which it undertakes its activities and the way in which

wishes its ratings to be understood and relied upon by the public

is captured by the home page on its website (www.esrb.org)

on which there is a picture of a mother holding her son's shoulders

and smiling as he plays a video game:



24.    The ESRB's creator, the ESA, is actually comprised of 24 video game

manufacturers who account for over 99% of domestic video games sales annually.  Defendant

Take-Two is a member of the ESA.

25.    The ESRB claims that it is responsible for the enforcement of its rating

system.  Every publisher of a game rated by the ESRB is legally bound to disclose all pertinent

content when submitting the game for an ESRB rating.  After a game is publicly released, ESRB

testers review the final product to ensure that all pertinent content was fully disclosed. In the

event that material that would have affected the assignment of a rating or content descriptor is

found to have not been disclosed, the ESRB is empowered to compel corrective actions and

8

impose a wide range of sanctions, including monetary fines. Corrective actions can include

pulling advertising until ratings information can be corrected, re-stickering packaging with

correct ratings information, recalling the product, and other steps the publisher must take.

26.    The ESRB system has six ratings. They are as follows:

Early Childhood:  Titles rated EC (Early Childhood) have content that may be

suitable for ages 3 and older. Contains no material that parents would find

inappropriate.

Everyone:  Titles rated E (Everyone) have content that may be suitable for ages 6

and older. Titles in this category may contain minimal cartoon, fantasy or mild

violence and/or infrequent use of mild language.

Everyone 10+: Titles rated E10+ (Everyone 10 and older) have content that may

be suitable for ages 10 and older. Titles in this category may contain more

cartoon, fantasy or mild violence, mild language and/or minimal suggestive

themes.

Teen:   Titles rated T (Teen) have content that may be suitable for ages 13 and

older. Titles in this category may contain violence, suggestive themes, crude

humor, minimal blood, simulated gambling, and/or infrequent use of strong

language.

Mature:  Titles rated M (Mature) have content that may be suitable for persons

ages 17 and older. Titles in this category may contain intense violence, blood and

gore, sexual content and/or strong language.

Adults Only:  Titles rated AO (Adults Only) have content that should only be

played by persons 18 years and older. Titles in this category may include

prolonged scenes of intense violence and/or graphic sexual content and nudity.

27.     Game manufacturers typically want games with the least restrictive ratings

because less than 1% of all video games are sold with an AO rating.  AO games do not appeal to

the majority of the population and are not sold by many leading retailers.  The highest selling

rated games are those with the Everyone (E) ratings (49%).

28.     The ESRB system itself is somewhat controversial.  As California Assemblyman

Leland Yee, speaker pro tem for the California Assembly, has publicly stated:

> There are . . . problems with the ESRB rating. Number one: there is an
> inherent conflict of interest. [Companies] don't want their game rated
> "AO," they want it rated "M" or lower so that more people can buy the
> game. So there is a tremendous pressure on the ESRB to not rate [games]
> "AO." The [video game] industry is paying the [ESRB] to do the rating.

## B.     The Defendants and *Grand Theft Auto: San Andreas*.

29.     Defendants Take-Two and its wholly-owned subsidiary Rockstar Games, Inc., as

noted, develop and market video games.  One of their primary markets is games aimed primarily

at teenagers, and younger children.  Their popular "Grand Theft Auto" series includes numerous

titles.  These games have been at the center of controversy for a number of years, even prior to

the matters directly at issue in this case.

30.     One federal court, when discussing the Grand Theft Auto series, opined that its

"[g]raphic depictions of depraved acts of violence, such as the murder, decapitation, and robbery

of women in [Grand Theft Auto] . . . fall well within the more general definition of obscenity."

*Video Software Dealers Association v. Maleng.,* 325 F. Supp. 2d 1180 (W.D. Wash. 2004).

31.     The controversy regarding the Grand Theft Auto games was certainly well known

10

to Defendants at the time that they developed, marketed and sold the version of the game at issue in this litigation, *Grand Theft Auto: San Andreas*. Particularly in light of Defendants' undoubted knowledge that its Grand Theft Auto games were exceedingly popular and also the subject of scrutiny and controversy, their inclusion of sexual explicit content in *Grand Theft Auto: San Andreas* is particularly egregious.

32.     *Grand Theft Auto: San Andreas* was released to the public on the PlayStation 2 platform in or about October 2004, and was carried for sale by the nation's largest chain retailers, among others.  It was the subject of a substantial advertising campaign which included targeting directed at minors.  *Grand Theft Auto: San Andreas* is available in a variety of formats, and can be played on the most popular hardware platforms for video games - namely, on a personal computer (a "PC"), on the Xbox system, and on the Sony PlayStation 2 system.  It was made available for sale in its Xbox and PC versions in June 7, 2005.

33.     According to reports, *Grand Theft Auto:  San Andreas* was the 17th highest selling video game in 2005.  It is reported that over 12 million copies of *Grand Theft Auto:  San Andreas* have been sold since its introduction.

34.     Prior to its marketing, *Grand Theft Auto:  San Andreas* was submitted to the ESRB for review and rating.  The game was assigned an "M" rating and this was the rating that was contained on the packaging for the game as it was sold to the public, including the Plaintiffs herein and the Class.

35.     Apparently undisclosed to the ESRB – and also undisclosed in the materials thereafter made available to the public – was the fact that the game, as developed, manufactured and sold by Defendants, contained explicit sexual content.  The existence of the pornographic

11

content was not disclosed in any form to the public prior to the time of the game's introduction, nor in connection with any marketing or promotional efforts for the game, nor on the game's packaging, nor on the game media itself.

36.     The sexual content has commonly become known as the "Hot Coffee" scenes. This name derives from the fact that during the course of the main plot of the game, the player (playing as the main character, Carl "CJ" Johnson) dates various "girlfriends," carrying out different "date missions" in order to improve his relationship with a particular girl. Once Carl has become particularly close to a girlfriend, she may end a successful date by inviting him into her house for "coffee" – an apparent euphemism for sex.

37.     The Hot Coffee scenes are contained within the game's code but they are hidden from the user and require what is known as a "modification" or "mod" in order to be accessed. However, the existence of mods is ubiquitous within the area of video games and producers of games, including Defendants here, have known of them and left the game scripts open for modifications in order to permit user created content or in order to access hidden content. Indeed, it has been reported that Defendants encouraged individuals to modify games notwithstanding that such mods may violate the games' license agreements. Mod creation is encouraged by companies, including Defendants herein, because mods add to the counter-culture image of games, enhancing their popularity, and hence their profitability.

38.     In the unmodified version of *Grand Theft Auto:  San Andreas*, when the Hot Coffee scenes are reached during game play, the player sees an exterior view of the girlfriend's house while hearing the muffled voices of Carl and his girlfriend as they apparently engage in sex.  When, however, the Hot Coffee mod is applied to the game, the explicit sexual content in

the game is unlocked and the player enters a minigame which allows the player to enter the

girlfriend's premises and control Carl's actions during sex. The sex scenes usually begin with

Carl's girlfriend performing fellatio on Carl. After a few seconds, the minigame shows Carl

having sex with the woman and their changing into different positions of intercourse. Depending

on the game player's movement of the game controller, the excitement of the woman increases

and the game player is complimented. If the game player does not properly maneuver the game

controller, the woman does not become excited and the game makes fun of the player by stating

that the "failure to satisfy a woman is a crime."

39.     As the game is played, the mod Hot Coffee scenes and content can be accessed

with different of Carl's girlfriends.

40.     The Hot Coffee scenes consist of directly explicit sexuality – including simulated

oral sex and intercourse. Clips of the scenes showing the main character engaging in sex with his

various girlfriends are contained in the DVD annexed to this Complaint.

41.     Moreover, while, in some parts of the game the characters in the Hot Coffee

scenes are partially or barely clothed, including a girl friend who is shown topless with bare

breasts, in other places they are more fully dressed. By virtue of other code in the game and

additional mods widely available, however, the bodies of the characters can be changed masked

so as to appear naked or more naked.

42.     Whether due to Defendants' intentionality, recklessness or negligence in

designing and selling the game – negligence exacerbated to, at a minimum, gross negligence, by

virtue of Defendants' knowledge of criticism of the game, their knowledge regarding the nature

of the gaming community and how hidden material is actively sought and investigated by

gamers, and Defendants' failure to make the Hot Coffee scenes inaccessible – once the existence

of the Hot Coffee scenes became known, accessing them became a relatively easy matter,

consisting of downloading of instructions and software widely available over the Internet and,

with respect to the Xbox and PS2 platforms, using, most often, a device called an Action Replay

Max (or "ARMAX") (or other similar hardware devices that exist).  The ARMAX is commonly

sold and readily available for video gamers and typically costs around $25.

43.     The public knowledge of the Hot Coffee scenes became prevalent when, in June

2005, a Dutch "modder" named Patrick Wildenborg (under the Internet alias "PatrickW"),

disclosed their existence and offered a mod to access the scenes.

44.     Almost immediately, as public knowledge spread, an outcry resulted.  For

example, United States Senators Hillary Rodham Clinton and Joseph Lieberman spoke out.

Senator Lieberman, for instance, demanded that the company allow for an independent analysis

of its code, while Senator Clinton promised to introduce legislation that would curb the sale of

violent video games to minors.  Indeed, Congress passed a resolution to have the Federal Trade

Commission investigate whether Defendants intentionally undermined the ESRB by having the

content in the game.   The news of what was occurring was reported on the July 21, 2005 front

page of *The New York Times*.

45.     Likewise, consumer and watchdog groups announced their offense at the

mislabeling and sale of a game with explicit sexual content.  For instance, the Parents Television

Council condemned it, while a demonstration was held in August 2005 outside Defendants'

headquarters.

46.     Initially, Defendants denied assertions that the Hot Coffee minigame was

14

"hidden" in the game, stating that the Hot Coffee modification (which they claim violated the game's End User Licence Agreement) resulted from hackers making "significant technical modifications and reverse engineering" to the game's code.

47.     Mr. Wildenborg, the individual who produced the first mod to access the Hot Coffee scenes responded, in turn, by issuing the following statement:

> All the contents of this mod was already available on the original disks. Therefore, the scriptcode, the models, the animations and the dialogs by the original voice-actors were all created by RockStar. The only thing I had to do to enable the mini-games was toggling a single bit in the main.scm file. (Of course it was not easy to find the correct bit). The Nude models that are used as a bonus in the Quick action version of the mod, were also already present on the original disk.
>
> But all this material is completely inaccesible in an unmodded version of the game. It can therefore not be considered a cheat, easter-egg or hidden feature. But is most probably just leftover material from a gameplay idea that didn't make the final release. I would really like to stress that this material is only accessible after willfully applying the hot coffee mod (or something similar) to the game.

48.     He concluded that there is absolutely no new content and that every piece of the required code was already contained in the game itself.

49.     He was correct.  Contrary to Defendants' statements, the content had already existed and was always available in the game, and it only needed to be accessed to be seen and played.  This is proven by the fact that the PlayStation 2 and Xbox versions of the game, which cannot have content added to them because they are stored on read-only DVDs, also contain the hidden sex Hot Coffee minigames.

50.     In other words, notwithstanding Defendants' denials, the sexual intercourse and other explicit sexual behavior content is part of the game's original code, rather than something

inserted into the game by the mod.

     51.    It was thus through the intentional behavior of the Defendants, or at a minimum, their grossly negligent action, that the easily accessible pornographic content was included in this game which was released into a market a field where Defendants knew gamers were always on the lookout for hidden material and where mods are continually being made widely available via the Internet.

     52.    The outcry over Defendants' actions caused the ESRB on July 20, 2005 to announce that it had been misled into granting the "M" rating to *Grand Theft Auto: San Andreas*. It revoked that rating and revised the game's rating to "Adults Only 18+" ("AO"). "After a thorough investigation, we have concluded that sexually explicit material exists in a fully rendered, unmodified form on the final discs of all three platform versions of the game (i.e., PC CD-ROM, Xbox and PS2)," said Patricia Vance, president of the ESRB in a press release issued that day. Ms. Vance also stated that:

> Considering the existence of the undisclosed and highly pertinent content on the final discs, compounded by the broad distribution of the third party modification, the credibility and utility of the initial ESRB rating has been seriously undermined.

     53.    Other industry observers also commented on the deception. The ratings board "has been in business for 11 years, and there has never yet been an incident of this kind," Doug Lowenstein, head of the ESA, was reported as saying.

     54.    Upon ESRB's rating change, several North American chain stores pulled the PC and console versions of the game from the shelves, including such major chains as GameStop, Sears, Hollywood Video, Blockbuster, Wal-Mart, Target, Best Buy, and Electronics Boutique.

55.     Further, eBay began removing copies of *Grand Theft Auto: San Andreas* that were reported by the eBay community.  eBay asserted that *Grand Theft Auto: San Andreas* violated the terms of the eBay seller policy and cannot be sold unless it is located in the "Everything Else > Mature Audiences" section, a section that requires a credit card to validate the age of the eBay user.

56.     In August 2005, Defendants announced a recall for all games still owned by the general public.  It made no concerted effort, however, to ensure that individuals, like the Plaintiffs in this case, were provided restitution of the monies they spent on the game, although it apparently has, in individually requested situations, refunded money to consumers.

57.     At the time, Defendants stated in a press release (dated August 26, 2005) that:

> Rockstar Games and Take Two Interactive regret that consumers may have been exposed to content that was not intended to be accessible in the playable version of Grand Theft Auto: San Andreas. The Company has taken significant steps to remedy this situation, including halting production of the current version of Grand Theft Auto: San Andreas, and has begun working on a version of the game that will not contain the elements used to enable the "hot coffee" modification. Going forward, the Company will refine the process by which it edits games and will enhance the protection of its game code to prevent such future modifications.
>
> Take-Two Interactive recognizes and takes seriously its responsibility to ensure that its games are rated and marketed appropriately. The Company will continue to support and promote the ESRB rating system to help keep mature-themed video game content out of the hands of children.

## C.     Defendants Continue To Disseminate Inappropriately Rated Video Games.

58.     Notwithstanding Defendants' promises and assurances in August 2005 – quoted immediately above – Defendants have continued to fail to ensure that the games they release are "rated and marketed appropriately."

59.     To the contrary, on May 3, 2006, the ESRB changed the rating for the video game

17

*The Elder Scrolls: Oblivion* from Teen 13+ ("T") to Mature 17+ ("M"). Defendant Take Two is the co-publisher of this game. The reason for the re-rating was because the game both contained excessive gore and of the discovery that female characters could appear topless.

60.     According to the ESRB's Website, it appears that between the time it re-rated *Grand Theft Auto: San Andreas* and the time it re-rated *The Elder Scrolls: Oblivion*, it re-rated no other games. In other words, while Defendants professed that they would adhere to proper standards, they have shown an inability to do so and are the only company to have acted in such a manner as to warrant re-rating not once, but twice, within a year.

61.     Defendants therefore, and notwithstanding their representations to the contrary, still do not have proper safeguards in place to ensure the proper rating of their games and unless enjoined from continuing to mis-rate their software will continue hereafter to mis-rate software.

## FIRST CAUSE OF ACTION
## FOR UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW
### (By All Plaintiffs on their behalf and on behalf of the Class)

62.     Plaintiffs hereby incorporate by reference paragraphs 1-61 as if fully set forth herein.

63.     Defendants had a statutory duty to refrain from unfair or deceptive acts or practices in the design, development, manufacture, promotion and sale of *Grand Theft Auto: San Andreas*.

64.     Had Defendants not engaged in the wrongful and deceptive conduct described above, Plaintiffs and members of the Class would not have purchased and/or paid for *Grand Theft Auto: San Andreas* and they have therefore proximately suffered injury in fact and ascertainable losses.

65.     Defendants' deceptive, unconscionable or fraudulent representations and material omissions to consumers, including the failure to inform consumers of the sexual content in the game and the mislabeling of the same, constituted unfair and deceptive acts and practices in violation of state consumer protection statutes.  As demonstrated by the incident involving *The Elder Scrolls: Oblivion*, and notwithstanding Defendants' representations even prior to that incident that they would henceforward ensure that its games are rated and marketed appropriately, Defendants failure to abide by their statutory duties has been or may be continuing.

66.     Defendants engaged in their wrongful conduct while at the same time obtaining sums of money from Plaintiff and Class members for games.

67.     Defendants' actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of state consumer protection statutes, including, but not limited to, Cal. Civ. Code §1770, *et seq.* and Cal. Bus. & Prof. Code § 17200, *et seq.*; 815 ILCS § 505/1, *et seq.*; Minn. Stat. §§ 325D.43, *et seq.*;, 325F.67, *et seq.*; and 325F.68 *et seq.*; N.Y. Gen. Bus. Law §§ 349 *et seq.* and 350-e, *et seq.*; and 73 Pa. Stat. § 201-1, *et seq.*, as well as substantially similar statutes in effect in the other States.

68.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class are entitled to a judgment that declaring that Defendants' actions have been in violation of their statutory duties, that provides injunctive relief in order to ensure continued wrongful and similar acts do not occur hereafter, and that provides compensatory damages, treble damages, attorneys' fees, and/or costs of suit.

19

## SECOND CAUSE OF ACTION
## FOR BREACH OF IMPLIED WARRANTY
**(By Plaintiffs Carlson, Casey, and Samario on their own behalf and on behalf of the Class)**

69.     Plaintiffs hereby incorporate by reference paragraphs 1-61 as if fully set forth herein.

70.     Defendants impliedly warranted that *Grand Theft Auto: San Andreas*, a mass consumer item which Defendants designed, manufactured, assembled, promoted and sold to the market for video games to Plaintiffs, were merchantable.

71.     *Grand Theft Auto: San Andreas* was not merchantable within the meaning of the law inasmuch as, by virtue of the "M" rating it had when purchased by Plaintiffs and the Class, it (a) could not pass without objection in the trade under its description (as demonstrated and proven by virtue of the re-rating of the game by the ESRB); (b) it was not adequately contained, packaged and labeled as part of the transaction; and/or (c) it did not conform to the promises and affirmations of fact made on the package and label for the game.  Therefore, Defendants breached the implied warranties of merchantability and fitness for a particular purpose when their games were manufactured and sold to Plaintiffs.

72.     Any disclaimers of implied warranties are ineffectual as they were not provided to Plaintiffs or otherwise made known to Plaintiffs, who were not informed of the material non-compliance of the goods to the represented rating.  In addition, any such disclaimers are unconscionable under the circumstances.

73.     As a direct and proximate result of Defendants' breach of implied warranty, Plaintiffs have sustained economic losses and other damages for which they are entitled to compensatory and/or equitable damages in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
## FOR UNJUST ENRICHMENT
### (By All Plaintiffs on their behalf and on behalf of the Class)

74.    Plaintiffs hereby incorporate by reference paragraphs 1-61 as if fully set forth

herein.

75.    Defendants obtained monies from the manufacture, distribution,  marketing and/or

sale of *Grand Theft Auto: San Andreas* a game that was, as they knew or reasonably should have

known was mislabled as an "M" game and that contained, as they knew or reasonably should

have known, contained explicit sexual content.  When considered under the totality of the

circumstances regarding Defendants' knowledge regarding their games, including the Grand

Theft Auto games in particular, and their knowledge regarding the nature of the gaming industry

and the prevalence of individuals who search for hidden material on video games and produce

"mods," and Defendants' failure to ensure that the game contained appropropriate safeguards to

prevent the unlocking of explicit sexual material, Defendants have been unjustly enriched to the

detriment of Plaintiffs and the other members of the Class, as alleged above, by retention of

consumer's purchase monies received directly or indirectly.  These unjust benefits were

conferred on Defendants by consumers as a direct result of the mislabeling and the game's

availability from mass market retailers, from whom the game would not otherwise have been

available had it been properly labeled.

76.    Defendants' retention of some or all of the monies they have gained through their

wrongful acts and practices would be unjust considering the circumstances of their obtaining

those monies.

77.    Defendants should be required to disgorge their unjustly obtained monies and to

make restitution to Plaintiffs and the other members of the Class, in an amount to be determined,

of the monies by which they have been unjustly enriched.

**FOURTH CAUSE OF ACTION**
**FOR VIOLATION OF THE SONG-BEVERLY ACT,**
**CALIFORNIA CIVIL CODE § 1790, *ET. SEQ.***
**(By Plaintiff Samario On Behalf of Himself And That Portion of The Class**
**Who Reside in California)**

78.     Plaintiffs hereby incorporate by reference paragraphs 1-61 as if fully set forth

herein.

79.     *Grand Theft Auto: San Andreas* is a "consumer good" within the meaning of Cal.

Civ. Code § 1791(a).  Defendants' implied warranty of merchantability arose out of and/or was

related to the sale to consumers of the game.

80.     As set forth more fully above, Defendants failed to comply with their obligations

under the implied warranty of merchantability.

81.     Plaintiff Samario and the California members of the Class have suffered damages

as a result of Defendants' failure to comply with their warranty obligations and Plaintiff Samario

and the California members of the Class are entitled to recover damages under the Song-Beverly

Act, including damages pursuant to Cal. Civ. Code §§ 1791.1(d) and 1794.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated,

pray for judgment against Defendants as follows:

1.     For an Order certifying the Class and any appropriate subclasses thereof

under the appropriate provisions of Federal Rule of Civil Procedure 23, and appointing

Plaintiffs and their counsel to represent such Classes and subclasses as appropriate under

22

Rule 23(g);

    2.      For the declaratory and equitable relief requested;

    3.      For compensatory, equitable and/or restitutionary damages according to proof and for all applicable statutory damages under the consumer protection legislation of the states and the District of Columbia and under, as to California residents, the California Song-Beverly Act;

    4.      For an award of attorneys' fees and costs;

    5.      For prejudgment interest and the costs of suit;

    6.      For such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a jury trial on all issues so triable.

Date:  June 7, 2006

                        Seth R. Lesser
                        LOCKS LAW FIRM, PLLC
                        110 East 55th Street
                        New York, New York 10022
                        (212) 838-3333 (tel)
                        (212) 838-3735 (fax)
                        Slesser@lockslawny.com
                        www.lockslaw.com

                        Plaintiffs' Lead Counsel

                        HARKE & CLASBY, _____
                        Lance A. Harke
                        Howard Bushman
                        155 South Miami Avenue, Suite 600
                        Miami, Florida 33130

(305) 536-8220
Fax:  (305) 536-8229

MEISELMAN, DENKLEA, PACKMAN,
CARTON & EBERZ
David Douglas
1311 Mamaroneck Avenue
White Plains, New York 10605
(914) 517-5000
Fax: (914) 517-5055

PASKOWITZ & ASSOCIATES
Laurence Paskowitz
60 East 42nd Street, 46th Floor
New York, New York 10165
(212) 685-0969
(Fax) (212) 685-2306

Plaintiffs' Executive Committee (pending
Court approval)


NESTER & CONSTANCE
David A. Nester
123 West Washington Street
Belleville, IL 62220
(618) 234-4440

LAW OFFICES OF LIONEL Z. GLANCY
Lionel Z. Glancy
1801 Avenue of the Stars
Suite 311
Los Angeles, California 90067
(310) 201-9150

MURRAY, FRANK & SAILER, LLP.
Eric James Belfi
275 Madison Avenue, Suite 801
New York, New York 10016
(212) 682-1818
Fax: (212) 682-1892

REINHARDT, WENDORF &

BLANCHFIELD
Mark Reinhardt
E-1250 First National Bank Building
332 Minnesota Street
St. Paul, Minnesota 55101
(651) 287-2100
Fax:  (651) 287-2103

John S. Steward
225 South Meramec, Suite 925
Clayton, MO. 63105
(314) 725-6060
Fax: (314) 862-9895

WEBER, GALLAGHER, SIMPSON,
STAPLETON, FIRES & NEWBY, LLP
Joseph Goldberg
2000 Market Street, 13th Floor
Philadelphia, PA. 19103
(215) 825-7225

Attorneys for Plaintiffs

## <u>CERTIFICATION OF SERVICE</u>

Kimberly Mahon, deposes and says, I am over the age of 18 years, employed in the county of New York, and not a party to the within action; my business address is 110 East 55th Street, New York, NY 10022.

On June 6, 2006, I caused to be served the within PLAINTIFF'S CONSOLIDATED AND AMENDED COMPLAINT on the party listed below by Federal Express Priority Overnight and by First-Class Mail by depositing same in a postage page wrapper into a box maintained exclusively by the U.S. Postal Service:

Leonard Steinman
Blank Rome, LLP.
The Chrysler Building
405 Lexington Avenue
New York, New York 10174

I caused to be served the within PLAINTIFF'S CONSOLIDATED AND AMENDED COMPLAINT on the parties listed below by First-Class Mail by depositing same in a postage page wrapper into a box maintained exclusively by the U.S. Postal Service:

John S. Steward, Esq.
225 South Meramec, Suite 925
Clayton, MO. 63105
(314) 725-6060

Lance A. Harke, Esq.
155 South Miami Avenue, Suite 600
Miami, Florida 33130
(305) 536-8220

Laurence Paskowitz, Esq.
Paskowitz & Associates
60 East 42nd Street, 46th Floor
New York, New York 10165
(212) 685-0969

Lionel Z. Glancy
Law Offices of Lionel Z. Glancy
1801 Avenue of the Stars
Suite 311
Los Angeles, California 90067
(310) 201-9150

Eric James Belfi, Esq.
Murray, Frank & Sailer, LLP.
275 Madison Avenue, Suite 801
New York, New York 10016
(212) 682-1818
Fax: (212) 682-1892

Mark Reinhardt, Esq.
Reinhardt, Wendorf & Blanchfield
E-1250 First National Bank Building
332 Minnesota Street
St. Paul, Minnesota 55101
(651) 287-2100

David Jonathan Meiselman
David S. Douglas
Meiselman, Denklea, Packman, Carton & Eberz
1311 Mamaroneck Avenue
White Plains, New York 10605
(914) 517-5000
Fax: (914) 517-5055

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June, 2006

_____
Kimberly Mahon