UNITED STATES DISTRICT COURT                           FILED ELECTRONICALLY
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                    :
*In re Grand Theft Auto Video Game Consumer*        :
*Litigation (No. II)*                               :        06-md-1739(SWK)(MHD)
------------------------------------------------------- :
                                                    :
This Document Relates to:                            :
*Cohen v. Take-Two Interactive Software, Inc., et*  :
*al.*, 05-cv-6734;                                   :
*Samario v. Take-Two Interactive Software, Inc., et* :
*al.*, 05 cv-6767;                                   :
*Carlson v. Take-Two Interactive Software, Inc., et* :
*al.*, 05-cv-6907;                                   :
*Casey v. Take-Two Interactive Software, Inc., et*  :
*al.*, 05-cv-10013;                                  :
*Stanhouse v. Take-Two Interactive Software, Inc.,* :
*et al.*, 05-cv-01174; and                           :
*Goldfine v. Take-Two Interactive Software, Inc., et*:
*al.*, 06-cv-6537.                                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

### DEFENDANTS' MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

Jeffrey S. Jacobson
919 Third Avenue
New York, New York  10022
Tel: (212) 909-6000
Fax: (212) 909-6836
Email: jsjacobson@debevoise.com

*Attorneys for Defendants Take-Two*
*Interactive Software, Inc. & Rockstar*
*Games, Inc.*

Defendants Take-Two Interactive Software, Inc. and Rockstar Games, Inc. ("Defendants") support Plaintiffs' motion for final approval of the parties' settlement. Defendants write separately in order to address two issues that do not affect class members in the case: (1) Plaintiffs' counsel's characterization of the charitable payment Defendants would make as a "*cy pres*" award, which Defendants reject, and (2) Plaintiffs' counsel's motion to be awarded an attorneys' fee of $1 million, which Defendants believe must be further substantiated before the Court should consider it.[1]

**1.      The Charitable Payment Does Not Constitute a *Cy Pres* Award.**

Defendants have asserted throughout these proceedings that no purchaser of Defendants' *Grand Theft Auto: San Andreas* ("*GTA:SA*") game actually was "harmed" or "defrauded" merely because an unauthorized third-party modification technique gave purchasers the *ability*, if they chose, to modify the game and view unfinished content that had been edited out of normal game play. *See* Declaration of Jeffrey S. Jacobson, dated May 27, 2008 ("Jacobson Decl."). ¶ 2. Plaintiffs have never disputed that players could view this so-called "Hot Coffee" content only by affirmatively taking complex steps, including installation of unauthorized third-party hardware and software in violation of the game license and/or the gaming console license. Indeed, the named plaintiffs themselves lacked the hardware necessary to access the content, and never actually saw it. *See id*. ¶ 3.

---

[1]      Although Defendants support approval of the settlement, Defendants strongly disagree with the inflammatory and inaccurate characterizations scattered gratuitously throughout Plaintiffs' moving papers. As just two examples, the content at issue in this case — which, in its original form, featured clothed characters and, in its third-party modified form featured a cartoon-like, undetailed nude female character — is not "pornography," as Plaintiffs' assert, and an "AO" rating by the Entertainment Software Rating Board ("ESRB") is not the equivalent of an "X" rated movie.

Additionally, the game's original rating of "Mature 17+" already indicated to all purchasers that the game was suitable for players 17 and older. *GTA:SA*'s rating by the ESRB included content descriptors stating that it contained "Blood and Gore," "Intense Violence," "Strong Language," "Strong Sexual Content" (which the ESRB defined to include the possibility of nudity), and "Use of Drugs." The ESRB's rating and warnings all appeared on the game packaging. *See* Jacobson Decl. ¶ 4.

For these reasons and others, from the outset of this case, Defendants have contended that of the estimated minimum 10 million primary and resale purchasers of *GTA:SA* who comprised the asserted class, few, if any, had a valid "fraud" claim. Defendants argued that a class of such purchasers could not be certified because determining who might have a valid claim and who does not would require unmanageable individual inquiries. *See* Jacobson Decl. ¶ 5. As the Second Circuit just made clear in *McLaughlin v. American Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008), when it reversed a decision certifying a fraud class for reasons similar to those Defendants asserted, Plaintiffs most likely could not have obtained certification of a litigation class. In fact, certification of even a *settlement* class in this matter is possible only because of Defendants' agreement, as part of the settlement, to waive their right to insist that each class member actually prove Defendants' liability to him or her.

Despite Defendants' belief that no harm had occurred and that the case would most likely be resolved in their favor, the settlement offered Defendants the ability to resolve this case for less than the costs of litigating it. At the same time, the settlement allowed Plaintiffs to claim a victory for whichever class members *believed* they were harmed. The settlement accomplishes these goals by dealing creatively and effectively with the reliance and causation components of a fraud claim. Plaintiffs agreed that Settlement Class Members, in order to

recover, must affirm that they were offended by the presence of the challenged content on the game discs and would have tried to return the game if they thought a refund would have been available.  Defendants, for their part, agreed to accept these affirmations without attempting to challenge them.  *See* Jacobson Decl. ¶¶ 6-7.

Once the parties reached this agreement, and the Court preliminarily approved it, the means of notifying the class was robust and effective.  The notice program included publication of a summary notice in periodicals having a combined readership of over 70 million, including in some of the most widely-circulated periodicals in the United States.  Dissemination of information also occurred vigorously on the Internet.  Defendants bought banner advertisements on several video gaming-centric websites, and extensive discussion of the settlement appeared on numerous web logs and other sites devoted to discussion of *Grand Theft Auto* specifically and video games generally.  Although Defendants believe that the notice program was more expensive than it needed to be, both sides agree that notice reached a significant percentage of the purchasers of *GTA:SA*.  As one measure of the effectiveness of the notice program, the settlement website received over 100,000 hits since the site became active on December 7, 2007.  *See* Jacobson Decl. ¶¶ 8-9.

Consistent with Defendants' belief that few, if any, purchasers actually consider themselves to have been "defrauded," however, only 2,676 people actually asserted harm and filed claims.  These 2,676 claimants collectively seek about $30,000 in cash and disc exchange benefits.  The tiny claims rate, despite a massively expensive notice program, confirmed that the overwhelming majority of *GTA:SA* purchasers simply were not offended, much less defrauded, by the Hot Coffee issue.  *See* Jacobson Decl. ¶ 10.

3

Despite the class only claiming $30,000 in benefits, Plaintiffs' counsel seeks to portray their efforts as having achieved a million-dollar benefit for "the class." They do this by calling the charitable payment that Defendants agreed to make as part of the settlement "*cy pres*" relief, and contending that it is at least an indirect benefit to the class. Plaintiffs' characterization, however, is not accurate.

The Settlement Agreement calls for Defendants to make a charitable payment in the amount of the difference between the compensation paid to the class (plus certain other amounts), and $1,025,000. (The parties presently estimate that this charitable payment will be somewhere between $800,000 and $900,000; the figure will be finalized after the Special Master submits his final bill.) The paragraph describing this payment does not refer to it as *cy pres*. Plaintiffs wanted the payment to be characterized that way, but Defendants refused. *See* Jacobson Decl. ¶11. Paragraph III.H. states that "Plaintiffs contend that this payment constitutes a *cy pres* remedy; Defendants do not necessarily agree with that characterization."

Defendants continue to disagree with the payment being characterized as *cy pres*, and the case law is on Defendants' side. The *cy pres* doctrine derives from the French term "*cy pres comme possible*," which means "as near as possible." The doctrine originated in trust cases to save charitable gifts that would otherwise fail. If the testator had a general charitable intent, but it was not possible to carry out the testator's specific wishes, the court would look to an alternate donee that would satisfy the testator's intent as near as possible. The rationale courts applied was that, given the testator's charitable intent, the testator would have preferred a modest alternation in the terms of the trust to having the surplus revert to his residuary legatees. *See generally Mirfasihi v. Fleet Mortg. Corp.,* 356 F.3d 781, 784 (7th Cir. 2004).

The charitable payment in the Settlement Agreement cannot reasonably be termed a *cy pres* award because, here, *all* eligible class members have been able to claim benefits *directly*. Although few *GTA:SA* purchasers actually declared themselves offended by the Hot Coffee content, had this number been higher, the Settlement Agreement would have required Defendants to pay the full value of hundreds of thousands of claims before any *pro rata* reduction would have begun. The Settlement Agreement also would have required Defendants to fulfill an *unlimited* number of disc exchange requests, regardless of cost. There thus was never a need to designate an "as near as possible" beneficiary.

The *Mirfasihi* decision, cited by Plaintiffs in support of their position that Defendants' charitable payment is a *cy pres* award, actually holds to the contrary. As the Seventh Circuit explained in *Mirfasihi*, 356 F.3d at 784:

> The [*cy pres*] doctrine, or rather something parading under its name, has been applied in class action cases, but for a reason unrelated to the reason for the trust doctrine. That doctrine is based on the idea that the settlor would have preferred a modest alteration in the terms of the trust to having the corpus revert to his residuary legatees. So there is an indirect benefit to the settlor. In the class action context the reason for appealing to cy pres is to prevent defendant from walking away from the litigation scot-free because of the infeasibility of distributing the proceeds of the settlement (or the judgment, in the rare case in which a class action goes to trial) to the class members. There is no indirect benefit to the class from the defendant's giving the money to someone else. In such a case the "cy pres" remedy (badly misnamed, but the alternative term — "fluid recovery" — is no less misleading) is purely punitive.

In this case, of course, calling the charitable payment a *cy pres* award is even less justified. Here, it was not "infeasib[le]" to "distribut[e] the proceeds of the settlement." Although it was certainly *expensive* to distribute those proceeds — the administrative costs of putting $30,000 into eligible class members' hands has exceeded $80,000 — the parties

agreed on a means to do so, and *will* do so if the Court approves the settlement.  This case, therefore, is unlike those Plaintiffs have cited, where individual payments were not made.

Defendants, moreover, would hardly be emerging "scot-free" from this litigation, even absent the charitable payment.  In addition to its own attorneys' fees and whatever fees Defendants may be ordered to pay to Plaintiffs' counsel, Defendants have absorbed nearly $1 million in notice and administration costs.  Also, before Plaintiffs filed their complaints, Defendants had resolved this matter with the ESRB, paid the costs of re-labeling "M17+"-rated games as "AO" for stores that continued to sell the original version, were in the process of preparing a patch to block modification of the PC version of the game, and were manufacturing new copies of the game without the Hot Coffee code.  The costs associated with all of these steps greatly exceeded those involved in litigating and settling these consumer cases.  *See* Jacobson Decl. ¶ 12.

Because the class is recovering benefits directly, it should not be necessary for Plaintiffs or the Court to characterize Defendants' charitable payment to the ESRB, for its work with the national Parent-Teacher Association, as a *cy pres* remedy.[2]  Plaintiffs' counsel's fee application is not based on the purported value of the settlement, but rather on their asserted "lodestar" of hours expended prosecuting the case.  Plaintiffs' counsel seem to be arguing for *cy pres* treatment for precedential reasons, and that is exactly why Defendants oppose it.  Because the case law does not support Plaintiffs' counsel's view, and because, in future cases, the issue could be relevant to the fairness of a contested attorneys' fee request, Defendants urge the Court not to adopt Plaintiffs' terminology for this charitable payment.

---

[2]     It is Defendants' understanding that they will be paying this money to the ESRB, and that the ESRB will use it to advance its existing partnership with the PTA to educate parents about the ESRB rating system.

**2.      Defendants Did Not Unconditionally Agree To Pay a $1 Million Attorney's Fee**

It is also wrong for Plaintiffs' counsel to contend that Defendants' agreed *unconditionally* not to oppose a $1 million fee request.  During settlement negotiations, Defendants expected a low claim rate and believed that this would highlight the essential frivolousness of Plaintiffs' claims.  Defendants fully expected to litigate the fee issue and to show that Plaintiffs' counsel were entitled to no more than a nominal fee award.  When the parties executed the Settlement Agreement, the document stated that there was no agreement on fees.  *See* Jacobson Decl. ¶ 13.

After the parties executed the Settlement Agreement, Plaintiffs' counsel initiated a discussion on fees.  Defendants made clear to Plaintiffs' counsel that if they wanted Defendants to forego the right to contest their fee application, they had to request no more than their *actual* fees, and could not request any positive "multiplier" of their asserted lodestar.  *See* Jacobson Decl. ¶ 14.  Plaintiffs' counsel's insistence on a multiplier caused the suspension of negotiations almost as soon as they began.  Contrary to the statement in Plaintiffs' counsel's brief (at 10-11) that the parties had "innumerable arms' length and contentious negotiations" thereafter, the parties, in fact, had no further discussions about fees for many weeks.  *See* Jacobson Decl. ¶ 15.

When discussions resumed on November 16, 2007, Plaintiffs' counsel represented that their lodestar as of that date was $950,000, with costs of $50,000.  *See* Jacobson Decl. ¶ 16.  They still demanded a small multiplier, which Defendants once again refused.  *See id.*  Later that day, however, Plaintiffs' counsel dropped their demand for a multiplier.  Based on Plaintiffs' counsel's representation that their actual lodestar, plus costs, totaled $1 million, Defendants agreed not to oppose a lodestar-based request in that amount.  No formal

7

agreement with respect to fees was ever executed, but the notice to class members indicated the parties' informal agreement on a fee of up to $1 million. *See id.* ¶ 17.

The Court has always made clear its intent to require Plaintiffs' counsel to document their fee requests. Defendants, for their part, have always insisted that Plaintiffs' counsel's fee be limited to no more than actual fees and expenditures, without any multiplier. It is thus not at all reasonable for Plaintiffs to seek such a large fee without actually demonstrating to the Court and the Special Master that the 11 law firms requesting money performed necessary work, in reasonable time, without undue overlap. Unfortunately, however, the firms have not included time records or any meaningful descriptions of the tasks they allegedly performed or the dates on which they performed them. With no time records and billing descriptions, it is impossible for Defendants or the Court to gauge whether Plaintiffs' counsel still are seeking a "stealth" multiplier. *See, e.g., Hensley v. Eckerhart*, 461 U.S. 424, 434-35 (only hours "reasonably expended" may be part of a fee).

The Locks Law Firm — designated as "Lead Counsel" in this matter — asserts a $553,000 lodestar at rates up to $550 per hour, bur provides no time detail. Strangely, the Lead Counsel's fee request accounts for only about 40% of the total asserted lodestar. Other law firms, most of which are unknown to Defendants and had no apparent role in prosecuting the case, claim collectively to have incurred nearly $800,000 in fees on this matter.

As one example, attorney Mark Cuker, who was not Lead Counsel, asserts that he spent 101.95 hours on the case. He claims a lodestar of $56,903, which implies an average rate of over $588 per hour — higher than Lead Counsel's — but states that he performed only a single substantive task: He took the deposition of Sam Houser, one of the Defendants' principals. It is not clear, however, why Plaintiffs' counsel assigned that task, and only that

task, to Mr. Cuker.  If Mr. Houser's deposition, which lasted less than a day, was so complex that it required nearly 100 hours of preparation, Plaintiffs' counsel clearly should have assigned the deposition to someone more familiar with the facts, or whose preparatory efforts would be useful in other aspects of the case.

As another example, attorney John Steward has submitted an application for $14,070. Other than filing a copycat complaint, however, the only tasks Mr. Steward says he performed were "review[ing] pleadings and correspondence and support[ing] New York counsel." Attorney Jeffrey Carton, who also had no apparent role in prosecuting the case, seeks nearly $80,000 for 230 hours of work on nebulously-defined tasks.  Other counsel's lodestar figures are based on rates of up to $645 per hour.

Plaintiffs' counsel's brief offers to provide detailed time records "should the Court wish it."  Pl. Fee Mem. at 2 n.1.  Defendants respectfully request that the Court direct Plaintiffs' counsel to provide those records to the Special Master.  If Plaintiffs' counsel are able to document a lodestar of $1 million for reasonable and necessary work performed without unnecessary overlap by multiple counsel, then Defendants, pursuant to their agreement and as reflected in the notice to class members, would neither support nor oppose Plaintiffs' counsel's request, and would pay such amount as the Court directs.  Defendants' lack of opposition, however — and its agreement not to appeal — has always been conditioned on Plaintiffs' applying only for their actual time, with no multiplier.  If, therefore, the Court or the Special Master were to determine that some of Plaintiffs' counsel's work was not necessary, involved undue overlap or inefficiency, or is being charged at an above-market rate, then Defendants would request that their fee be reduced by that amount, so that no "stealth" multiplier is awarded.

Second Circuit law places "the burden . . . on [plaintiffs'] counsel in the first instance to submit detailed contemporaneous time records." *Jones v. Amalgamated Warbasse Houses, Inc.*, 721 F.2d 881, 885 (2d Cir. 1983), *citing Hensley*, 461 U.S. 424 at  440 (Burger, C.J., concurring) ("[W]hen a lawyer seeks to have his adversary pay the fees of the prevailing party, the lawyer must provide detailed records of the time and services for which fees are sought.").  The burden is on Plaintiffs' counsel to demonstrate "the prevailing market rate for attorneys of like skill litigating cases similar to plaintiff's." *See, e.g., Moreno v. Empire City Subway Co.*, 2008 WL 793605, at *7 (S.D.N.Y. Mar. 26, 2008).   Recent approvals of class action settlements by judges in this District all have noted that the plaintiffs' counsel's fee requests have been supported by "detailed time records." *See, e.g., In re Merrill Lynch Tyco Research Sec. Litig.*, 2008 WL 1777739, at *19 (S.D.N.Y. Apr. 16, 2008); *Hnot v. Willis Group Holdings, Ltd.*, 2008 WL 1166309, at *2 (S.D.N.Y. Apr. 7, 2008); *Moreno v. Empire City Subway Co.*, 2008 WL 793605, at *4 (S.D.N.Y. Mar. 26, 2008).  Defendants believe that the same should occur here.

## CONCLUSION

Defendants support Plaintiffs' motion for approval of the proposed settlement, but request that the Court (1) not construe Defendants' charitable payment as a *cy pres* award, and (2) require Plaintiffs' counsel to submit detailed time records to the Special Master for review before ruling on their motion seeking an award of fees.

Dated: New York, New York
      May 27, 2008

DEBEVOISE & PLIMPTON LLP

By: _____ /s/ Jeffrey S. Jacobson _____
     Jeffrey S. Jacobson
     919 Third Avenue
     New York, New York  10022
     Tel: (212) 909-6000
     Fax: (212) 909-6836
     Email: jsjacobson@debevoise.com

     *Attorneys for Defendants Take-Two*
     *Interactive Software, Inc. and*
     *Rockstar Games, Inc.*